*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LATASHA SLATER, Personal Representative of the
ESTATE OF PRISCILLA SLATER,

       Plaintiff-Appellee,

v

DETECTIVE SERGEANT JAMES
RUTHENBERG, DEPUTY CHIEF JOHN
VORGITCH, OFFICER AVOLON OWENS,
OFFICER TAEYLOR RYANS, OFFICER
NATALIE ANDERSON, OFFICER CHRISTINE
WHITE, OFFICER ELIJAH LOWERY, OFFICER
DANIEL MCCAW, OFFICER CHRIS JOSEPH, and
LIEUTENANT CHRIS SHAFT,

       Defendants-Appellants.

UNPUBLISHED
November 12, 2024
10:27 AM

No. 366162
Wayne Circuit Court
LC No. 21-007076-NO

Before: MARKEY, P.J., and SWARTZLE and MARIANI, JJ.

PER CURIAM.

In this wrongful-death action, defendants appeal by right the trial court's order denying their motion for summary disposition. Defendants unsuccessfully argued that they were shielded by governmental immunity as a matter of law. We conclude that reasonable jurors would agree that defendants' conduct did not amount to gross negligence. Accordingly, we reverse and remand for entry of judgment in favor of defendants.

## I. BACKGROUND

Officers with the Harper Woods Police Department (HWPD) arrested Priscilla Slater and lodged her in the Harper Woods jail on charges of possession of heroin and carrying a concealed

weapon (CCW).[1]  There is no dispute that Priscilla had been consuming alcohol.  Within approximately 36 hours of her incarceration, Priscilla was found deceased in her jail cell on June 10, 2020; she had been dead for about seven hours without discovery.  There were conflicting expert opinions concerning the cause of Priscilla's death, which occurred after she suffered a seizure in her cell.  As the personal representative of her sister's estate, plaintiff, Latasha Slater, filed this wrongful-death suit against defendants, who were employed by the city of Harper Woods (the city) and held various positions as police officers and civilian aides (CAs).  Plaintiff alleged that defendants engaged in gross negligence and wanton and willful misconduct by not obtaining medical care and treatment for Priscilla and not properly monitoring her health status despite her extreme intoxication, which nonfeasance was the proximate cause of her death by alcohol withdrawal syndrome.

Defendants moved for summary disposition under MCR 2.116(C)(7), (8), and (10), arguing that they were protected by governmental immunity under MCL 691.1407(2).  Defendants contended that they were not grossly negligent as a matter of law because there were no signs of extreme intoxication, Priscilla expressed that she was fine, and because defendants had no information regarding her medical history of severe alcohol abuse, alcohol withdrawal syndrome, related hospitalizations, and detoxification efforts.  Defendants further argued that Priscilla died of natural causes due to cardiac dysrhythmia of undetermined etiology and that their conduct was not the proximate cause of her death.

Plaintiff maintained that genuine issues of material fact existed with respect to both gross negligence and proximate cause.  The documentary evidence presented by the parties focused on the state of Priscilla's health and her physical condition when arrested and while housed in jail, the level of attention and care given her by defendants in light of her health and condition, and the physiological cause of her death.  The trial court denied defendants' summary disposition motion, concluding that reasonable minds could differ on the issue of gross negligence and that there otherwise existed "questions of fact all over the place."  Defendants appeal by right contending that (1) no reasonable juror could find that defendants were grossly negligent and that (2) no reasonable juror could conclude that defendants' conduct was the proximate cause of Priscilla's death.

---

[1] Police responded to a report of multiple gunshots at the Parkcrest Inn shortly before 1:00 a.m. on June 9, 2020.  Through witness interviews, review of video footage from surveillance cameras at the motel, and the officers' investigation, it was ascertained that the alleged shooter was Lewis Nichols, that he was accompanied by his girlfriend, Priscilla, that Nichols and Priscilla were apprehended in a vehicle parked at the motel, that Nichols was arrested on various charges, including assault with intent to commit murder, and that Priscilla was arrested on the basis that a gun and heroin were found in the car.  There was evidence that Priscilla had become embroiled in an argument with other motel patrons, after which she ran back to her motel room. Nichols then emerged from that room armed with a pistol, which he discharged 19 times across the parking lot toward the persons with whom Priscilla had been arguing.  Fortunately, no one was struck by gunfire.

## II.  ANALYSIS

### A.  STANDARD OF REVIEW, SUMMARY DISPOSITION PRINCIPLES, AND RULES OF STATUTORY CONSTRUCTION

We review de novo a trial court's ruling on a motion for summary disposition. *Champine v Dep't of Transp*, 509 Mich 447, 452; 983 NW2d 741 (2022).  This Court likewise reviews de novo the applicability of governmental immunity to a particular set of circumstances. *Id.*; *Ray v Swager*, 501 Mich 52, 61; 903 NW2d 366 (2017).  We also review de novo issues of statutory construction. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

MCR 2.116(C)(7) provides for summary dismissal of an action "because of . . . immunity granted by law."  The moving party may submit affidavits, depositions, admissions, or other documentary evidence in support of the motion if substantively admissible. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008).  The contents of the complaint must be accepted as true unless contradicted by the documentary evidence. *Id*.  This Court must consider the documentary evidence in a light most favorable to the nonmoving party for purposes of MCR 2.116(C)(7). *Moraccini v City of Sterling Hts*, 296 Mich App 387, 391; 822 NW2d 799 (2012).  When there is no factual dispute, the determination whether a plaintiff's cause of action is barred under a principle set forth in MCR 2.116(C)(7) is a question of law for the court to decide. *Id*.  But when a relevant factual dispute does exist, summary disposition is not appropriate. *Id*.  "If reasonable jurors could honestly reach different conclusions regarding whether conduct constitutes gross negligence, the issue is a factual question for the jury." *Oliver v Smith*, 290 Mich App 678, 685; 810 NW2d 57 (2010).[2]

With respect to the rules of statutory interpretation, this Court in *Slis v Michigan*, 332 Mich App 312, 335-336; 956 NW2d 569 (2020), explained:

> This Court's role in construing statutory language is to discern and ascertain the intent of the Legislature, which may reasonably be inferred from the words in the statute. We must focus our analysis on the express language of the statute because it offers the most reliable evidence of legislative intent. When statutory language is clear and unambiguous, we must apply the statute as written. A court is not permitted to read anything into an unambiguous statute that is not within the manifest intent of the Legislature. Furthermore, this Court may not rewrite the plain statutory language or substitute its own policy decisions for those decisions already made by the Legislature.
>
> Judicial construction of a statute is only permitted when statutory language is ambiguous. A statute is ambiguous when an irreconcilable conflict exists between statutory provisions or when a statute is equally susceptible to more than one meaning. When faced with two alternative reasonable interpretations of a word

---

[2] Although defendants also moved for summary disposition under MCR 2.116(C)(8) and (10), the gist of their position was that they had immunity granted by law; therefore, MCR 2.116(C)(7) is the relevant provision.

in a statute, we should give effect to the interpretation that more faithfully advances the legislative purpose behind the statute. [Quotation marks and citations omitted.]

## B. GOVERNMENTAL IMMUNITY – GENERAL GUIDING PRINCIPLES

MCL 691.1407, which is part of the governmental tort liability act (GTLA), MCL 691.1401 *et seq.*, provides, in pertinent part, as follows:

(2) Except as otherwise provided in this section, and without regard to the discretionary or ministerial nature of the conduct in question, each officer and employee of a governmental agency . . . is immune from tort liability for an injury to a person . . . caused by the . . . employee . . . while in the course of employment or service . . . if all of the following are met:

(a) The . . . employee . . . is acting or reasonably believes he or she is acting within the scope of his or her authority.

(b) The governmental agency is engaged in the exercise or discharge of a governmental function.

(c) The . . . employee's . . . conduct does not amount to *gross negligence* that is *the proximate cause* of the injury or damage. [Emphasis added.]

This appeal solely concerns MCL 691.1407(2)(c); there is no dispute for purposes of the summary disposition motion that defendants were acting in the course of their employment, that they were acting within the scope of their authority, and that the governmental agency was engaged in the exercise or discharge of a governmental function, all in relation to the arrest, incarceration, care, and oversight of Priscilla.

Under the GTLA, "the burden . . . fall[s] on the governmental employee to raise and prove his entitlement to immunity as an affirmative defense." *Odom*, 482 Mich at 479.[3] Accordingly, it was not necessary for plaintiff to plead her claims in avoidance of governmental immunity, although she effectively did so. We note that "[t]he governmental immunity statute does not itself create a cause of action called 'gross negligence.' " *Cummins v Robinson Twp*, 283 Mich App 677, 692; 770 NW2d 421 (2009).

---

[3] On the other hand, "[a] plaintiff filing suit against a governmental *agency* must initially plead his claims in avoidance of governmental immunity." *Id.* at 478-479 (emphasis added). "Placing this burden on the plaintiff relieves the government of the expense of discovery and trial in many cases." *Id.* at 479.

-4-

## C. GROSS NEGLIGENCE

### 1. BASIC GOVERNING PRINCIPLES

MCL 691.1407(8) defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." Gross negligence "has been characterized as a willful disregard of safety measures and a singular disregard for substantial risks." *Oliver*, 290 Mich App at 685. "Grossly negligent conduct must be conduct that is substantially more than negligent." *Bellinger v Kram*, 319 Mich App 653, 659-660; 904 NW2d 870 (2017). "Generally, allegations or evidence of inaction or claims that a defendant could have taken additional precautions are insufficient." *Id.* at 360.[4] But "evidence that a defendant engaged in affirmative actions contrary to professionally accepted standards and then sought to cover up those actions does establish gross negligence." *Id.* Gross negligence suggests actions in which "the actor simply did not care about the safety or welfare of those in his charge." *Tarlea v Crabtree*, 263 Mich App 80, 90; 687 NW2d 333 (2004). Even the negligence standard of conduct "does not require one to exhaust every conceivable precaution to be considered not negligent." *Id.*

### 2. DISCUSSION AND RESOLUTION

Because we must view the evidence in a light most favorable to plaintiff, we first assume that Priscilla died from alcohol withdrawal syndrome and that the signs and symptoms of the syndrome include vomiting, increased heart rate, increased blood pressure, anxiety, confusion, disorientation, delirium, and generalized seizures, all as set forth in the affidavit of Dr. Ljubisa Dragovic, plaintiff's expert.

Next, we believe that it is appropriate to rule out in fairly short fashion a number of defendants with respect to whether they were grossly negligent. As demonstrated and established by Officer Daniel McCaw's bodycam footage, his deposition testimony, and the deposition testimony of the other officers who responded to the motel at the time of the shooting, it was primarily if not solely Officer McCaw who personally and closely interacted with Priscilla from the time that she was removed from the backseat of the vehicle in which she and Nichols were found until she was placed in a police car and taken to the HWPD jail by Officer McCaw. Officer McCaw, to the exclusion of the other officers, was plainly in control of matters in relation to handling, arresting, monitoring, and transporting Priscilla, along with any associated decision-making in connection with her care. The other officers were focused on Nichols and different aspects of the investigation into the shooting. We conclude that when viewed in a light most favorable to plaintiff, the documentary evidence established as a matter of law that Officer Elijah Lowery, Officer Chris Joseph, and Lieutenant Chris Shaft did not engage in conduct so reckless as to demonstrate a substantial lack of concern for whether Priscilla might suffer an injury. Given

---

[4] A mere allegation that a defendant "could have done more" does not suffice "to meet the standard for gross negligence under the GTLA." *Dougherty v Detroit*, 340 Mich App 339, 350; 986 NW2d 467 (2021). Nevertheless, an omission to act can constitute gross negligence. See *Tallman v Markstrom*, 180 Mich 141, 144; 446 NW2d 618 (1989).

the events that transpired at the motel, we conclude that there would be little logic to a finding that the three officers were grossly negligent in regard to Priscilla's care.

We further conclude as a matter of law that Detective-Sergeant James Ruthenberg was not grossly negligent. Although Detective-Sergeant Ruthenberg was aware of the circumstances surrounding Priscilla's arrest and the events that transpired the night before, including the fact that Priscilla had been drinking and used heroin, by the time that he first met and interviewed Priscilla the following morning, there was nothing that Priscilla said and nothing in her conduct, demeanor, and behavior suggesting that she was in need of medical care and treatment or that she was in any physical distress. As reflected in video footage of the interview or interrogation, she certainly no longer appeared intoxicated or under the influence of drugs. Moreover, there was no evidence that Detective-Sergeant Ruthenberg knew of Priscilla's medical history of alcohol abuse and detoxification or witnessed signs or symptoms of alcohol withdrawal syndrome. In sum, the documentary evidence, even when viewed in a light most favorable to plaintiff, failed to show that Detective-Sergeant Ruthenberg engaged in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Priscilla.

With respect to CAs Avolon Owens, Taeylor Ryans, Natalie Anderson, and Christine White, we hold as a matter of law that the CAs did not engage in conduct so reckless as to demonstrate a substantial lack of concern for whether an injury resulted to Priscilla. CA Owens, aside from booking Priscilla after she arrived at the jail on June 9, 2020, was responsible for regularly checking her jail cell until 5:30 a.m. on the 9th, and he was also responsible for performing 30-minute-interval cell checks from midnight to 5:30 a.m. on June 10, 2020, during which time Priscilla died at approximately 5:12 or 5:13 a.m. We will discuss CA Owens in more detail below. CAs Anderson and White performed 30-minute-interval cell checks on Priscilla during the day and evening of June 9, 2020, and they engaged in brief verbal interactions with Priscilla, who never requested medical care or attention. Examining the video-footage report issued by the Michigan State Police (MSP),[5] the jail-cell video, and the detainee welfare check log, and assuming that Priscilla vomited at 6:20 p.m. on June 9th as suggested by video footage, we conclude that CA White would not have seen that occurrence when she did cell checks at 6:00 p.m. and 6:30 p.m. on June 9th. There is simply no evidence putting CAs Anderson and White on alert that Priscilla was in danger of suffering from alcohol withdrawal syndrome such that they should have sought a medical evaluation.[6] Moreover, even if we were to presume that they should have performed in-cell, face-to-face checks on Priscilla every 30 minutes, we find no evidence demonstrating that had they done so, they would have discovered facts that necessitated the involvement of medical personnel. Plaintiff argues that Priscilla was lethargic and slept almost the entire time that she was in her jail cell, which should have been noticed by the CAs and triggered a call for intervention by healthcare professionals. This argument ignores the fact that

---

[5] The MSP's report followed and described Priscilla's movements in the jail from intake to her death and aftermath, as depicted in jail surveillance cameras that covered most but not all of Priscilla's movements.

[6] Given that Priscilla was not showing any signs of intoxication or being under the influence of heroin when she was interviewed by Detective-Sergeant Ruthenberg around 10:00 a.m. on June 9, CAs Anderson and White would also not have witnessed such signs later in the day.

-6-

Priscilla was up during the very early morning hours of June 9 (after midnight), followed by being booked in the middle of the night (around 3:00 a.m.) and then being brought to an interrogation the next morning (around 10:00 a.m.), all after a night of drinking. That Priscilla was sleeping most of the time would have come as no surprise. And failing to enter her cell and interrupt her sleep every 30 minutes can hardly be characterized as gross negligence.

With regard to CA Ryans, we find that nothing she did during her shift on June 10, 2020, had any relevance because Priscilla was already deceased when her shift started. As to her shift on June 9, 2020, CA Ryans performed cell checks on Priscilla from 6:00 a.m. until noon, and, as reflected in the MSP's video-footage report and jail-cell video, Priscilla was asleep from 6:00 a.m. until about 10:00 a.m., at which time Detective-Sergeant Ruthenberg retrieved Priscilla from her cell and interviewed her. Assuming that CA Ryans should have performed in-cell, face-to-face checks on Priscilla every 30 minutes, we conclude she would not have discovered anything triggering a belief that it was necessary to obtain medical care and treatment for Priscilla. There is simply no evidence putting CA Ryans on alert that Priscilla was suffering from alcohol withdrawal syndrome such that she should have sought a medical evaluation.[7]

With respect to the defendants discussed above for which summary dismissal is appropriate on the issue of gross negligence, we concur that their knowledge of Priscilla's intoxication and drug use might demonstrate ordinary negligence for failure to procure medical assistance or treatment, but it does not constitute gross negligence. Priscilla never indicated that she needed medical assistance or treatment or that she felt ill, nor did the record reveal that she was so intoxicated that she lacked the capacity to ask for medical intervention or to express that she was sick. And there were no signs that she was in physical distress. Moreover, there was no evidence that defendants knew about Priscilla's history of alcohol abuse, alcohol withdrawal, and detoxification. Further, with regard to the signs and symptoms of alcohol withdrawal syndrome, there was the sole instance of vomiting (upon viewing the evidence in a light most favorable to plaintiff), which we addressed and discounted earlier, and any confusion or disorientation Priscilla exhibited was early on and could reasonably be attributed to her consumption of alcohol and use of heroin. To the extent that defendants failed to recognize early medical signs of alcohol withdrawal syndrome, it would hardly amount to *gross* negligence on their part.

Turning the focus of the analysis to Officer McCaw and CA Owens, we find that the resolution of whether there is a question of fact regarding gross negligence is a closer call. On the underlying issue of whether Priscilla was "extremely" intoxicated, our review of the pertinent video footage leads us to conclude that Priscilla was not in a state of "extreme" intoxication as a matter of law, i.e., reasonable minds would not disagree on the matter. She was plainly intoxicated to some degree, which both Officer McCaw and CA Owens acknowledged, but she could still converse and communicate effectively with them and answer their questions, and her movements were not seriously affected by her consumption of alcohol and drugs. We note that motel surveillance footage showed Priscilla walking and either running or walking swiftly without

---

[7] Our conclusions regarding the CAs would be no different even if the HWPD's General Orders required the CAs to physically monitor Priscilla every 15 minutes on the basis that she had "special needs."

difficulty on an outdoor walkway around the second level of the motel around the time of the shooting. Furthermore, when CA Owens asked Priscilla to stand on two sets of footprint markings on the floor for purposes of mug shots taken from two different angles, Priscilla easily maneuvered with agility and made the marks.

Assuming that a question fact exists as to whether Priscilla was extremely intoxicated, we note that HWPD's General Order 14-16, § IX, [E][1][a] provides that if a person in custody shows signs of "extreme drug/alcohol intoxication," an officer "shall" "[s]ummon EMS as soon as reasonably possible . . . ." Neither Officer McCaw nor CA Owens summoned EMS. With respect to the internal rules and regulations of the HWPD, in *Meyers v Rieck*, 509 Mich 460, 473-475; 983 NW2d 747 (2022), our Supreme Court recently discussed the interplay between an entity's internal rules and regulations and the standard of care in negligence cases, explaining:

> We long ago held that a private entity's internal rules do not fix the standard of its duty to others. That standard is fixed by law, either statutory or common. In other words, a defendant's violation of its own internal rule, even if the rule is designed to protect the public, does not constitute negligence per se. As such, the mere allegation that a defendant breached its own internal rule or regulation does not, without more, make out a claim for negligence. . . . .

> There are good reasons for this rule. Allowing a private organization's rules and regulations to establish the standard of care would permit that organization to choose the standards under which it would be liable to others. Choosing this course would send a signal . . . that they have a safe harbor from lawsuits if they comply with [their internal rules and regulations]. . . . If the order here, for example, had instructed the nurses to wait a day after the second episode of vomiting before contacting the physician, we would be reluctant to hold that a nurse followed the requisite standard of care simply by complying with such a slack order.

> Plaintiff's view might also discourage entities from adopting internal rules that require a higher degree of care than the law imposes. If the adoption of such a course is to be used against him as an admission, he would naturally find it to his interest not to adopt any rules at all. . . . In short, the law neither permits corporations to legislate away their responsibilities by rules, nor imposes discriminating liabilities upon them by reason of their efforts to lessen public danger. [Quotation marks, citations, brackets, and ellipses omitted.[8]]

---

[8] The *Meyers* Court, however, also observed:

> A private entity's internal rules or regulations, like the standing order, are not inadmissible simply because they do not alone establish the standard of care. If they meet the rules governing the admission of evidence and if the jury is instructed as to their proper use—i.e., that they are evidence of the standard of care and do not fix the standard itself—then they might be admitted. [*Myers*, 509 Mich at 482.]

Accordingly, the HWPD's General Orders did not fix the standard of care, but they could constitute evidence of the standard of care. Accepting that Priscilla was extremely intoxicated, we conclude that the failure of Officer McCaw and CA Owens to involve EMS was at most ordinary negligence given that it was a judgment call on a very arguable issue. The failure to contact EMS did not reflect a willful disregard for Priscilla's health and well-being.

We conclude that there was insufficient documentary evidence to create an issue of fact regarding whether Officer McCaw and CA Owens were grossly negligent for failing to secure medical care and treatment for Priscilla in light of her level of intoxication. This would be an easy issue to resolve if there were evidence specifically indicating that Officer McCaw and CA Owens had actual knowledge of Priscilla's medical history regarding alcohol abuse, alcohol withdrawal, and detoxification. In that case, there clearly would be a basis to rule that there existed an issue of fact with respect to gross negligence. It would also be a different story had Priscilla asked for medical care and was rebuffed, or had she responded that she was not okay when asked, or if she had exhibited clear signs or symptoms of being in physical distress, which were ignored. While the existing record might support an action for ordinary negligence against Officer McCaw and CA Owens, the record does not support a conclusion that the two officers "simply did not care about the safety or welfare" of Priscilla, *Tarlea*, 263 Mich App at 90, when they failed to obtain medical care on observation of her state of intoxication.

With respect to CA Owens, it is also necessary to consider his role in performing cell checks every 30 minutes on June 10, 2020. During CA Owens's shift, Priscilla was sleeping up until her seizure and death, except for a brief three-minute span starting at about 2:38 a.m. when she used the toilet and got a drink of water. Priscilla suffered the seizure at 5:10 a.m. and died within two or three minutes, which would not have been observed by CA Owens on his 5:00 a.m. check, assuming that he did check on her. There is no basis to find that CA Owens was grossly negligent for not procuring medical care for Priscilla before her seizure and death because there was nothing suggesting that she needed medical assistance until the terminal seizure occurred— the night had been uneventful until the seizure struck. To the extent that CA Owens was not performing any checks throughout the night, as arguably implied in an MSP handwriting-analysis report of cell-check log entries, it might constitute ordinary negligence, but without evidence that CA Owens knew or should have known that Priscilla's health was endangered, skipping the checks would not reach the level of gross negligence. And Priscilla was no longer intoxicated or under the influence of heroin when CA Owens started his shift at midnight on June 10th. We conclude that CA Owens was not grossly negligent as a matter of law with respect to his task of checking Priscilla's cell every 30 minutes.[9]

---

[9] Priscilla informed CA Owens that she was pregnant; however, we are of the view that this additional information, which did not include any specifics regarding the length of the pregnancy, did not suffice to make CA Owens's conduct grossly negligent for failure to procure medical care for Priscilla in connection with alcohol withdrawal syndrome. Moreover, we agree with our concurring colleague that any gross negligence by CA Owens was not, as a matter of law, the proximate cause of Priscilla's death.

## III. CONCLUSION

We hold that no reasonable juror could find that defendants were grossly negligent. Accordingly, we reverse and remand for entry of judgment in favor of defendants. In light of our ruling, it is unnecessary to reach the proximate-cause issue. We do not retain jurisdiction. We decline to tax costs under MCR 7.219.

/s/ Jane E. Markey
/s/ Brock A. Swartzle